AYRES, Judge.
This is an expropriation proceeding. The issues on appeal, concerning the just and adequate compensation to he paid, relate to the value of a residence and a bomb or fallout shelter on the property taken and to severance damages to the remainder of the property. No issue is presented as to the value of the land taken in fee or under a permanent servitude of drainage.
Out of a tract of land of approximately 100 acres, plaintiff, for the construction of a segment of Interstate 20, expropriated 21.-458 acres in full ownership, together with the improvements thereon, and a permanent servitude of drainage on an additional .072 acres.
Plaintiff’s estimate of the just and adequate compensation to be paid in the sum of $31,271.00, consisting of $28,502.00 for the property and property rights taken, and $2,769.00 for severance damages, was deposited in the registry of the court on the institution of this proceeding. Defendants, in an original answer, demanded $4,364.00 for the land taken, $44,857.00 for the improvements thereon, and $10,300.00 as severance damages. In an amended answer, defendants increased their demands to $58,-079.23 for the improvements taken. The value of the land taken in fee and under servitude was stipulated to be $200.00 per acre.
After trial, the court concluded the improvements taken had a value of $34,712.20, which included $31,631.20 for the residence and bomb or fallout shelter, fixed the severance damages at $7,850.00, and awarded defendants a total of $46,769.20. From the judgment, defendants appealed and seek an increase in the awards for the residence and bomb or fallout shelter and for severance damages. By answer to the appeal, plaintiff seeks a reduction in the awards to the amount of its original estimation and for a judgment against defendants for the amount of the excess thereof paid pursuant to judgment of court.
The improvement whose value constitutes' a major concern on this appeal is a unique structure in that it comprises a residence-aboveground and a bomb or fallout shelter underneath. All exterior walls above as well as below ground level were of 8-inch steel reinforced concrete. The exterior walls aboveground were finished with asbestos siding. The basement floor was constructed of concrete similar to that of the walls. A 4-inch steel reinforced concrete slab covered the underground portion of the structure. This slab also served as a floor for the upper portion. A similarly constructed concrete slab overlaid the top-of the upper, or residential, portion of the structure, covered with five plies of felt and' coal tar, with two additional plies of finished roofing. Edges of the roof were designed so that water to an average depth of two to four inches could be maintained on the roof at all times. The presence of the water on the roof served to cool the residence as well as to protect it against gamma rays in the event of a nuclear attack.
The upper portion of the structure, containing a floor space of 1,735 square feet,, served as a 3-bedroom residence. The interior walls were paneled with knotty pine, masonite, and beaver board; the ceilings-were knotty pine. The lower portion of the structure, with wood-paneled walls and a floor space of 1,485 square feet, was partitioned into five rooms, with asphalt tile floors, and a large storage area with vinyl tile flooring. The lower section served as bunkers and, as heretofore stated, a bomb or fallout shelter. Thus, it may be said that the structure comprised two residences, one above and the other below ground level.
Plans and specifications for the structure were prepared by L. P. Crossland, Jr., one of defendants. He had a bachelor’s degree from Louisiana Polytechnic Institute in mechanical engineering as well as years of practical experience in his profession. From the plans and specifications, prepared in the minutest detail, there was envisioned a concrete structure with an extraordinary compression strength. Though the struc *900 ture was described by Crossland as adequate for a bomb or fallout shelter, it was so ■constructed that additional protection could be afforded by sandbagging. The structure was particularly designed to furnish protection against fires and storms, matters with which the Crosslands had had some dreadful experiences, as well as against nuclear explosions and fallouts arising therefrom. Erection of this complex improvement began in 1947 and was completed by Crossland, with the assistance of his parents, some 12 years later. This completion preceded the expropriation of the property by about two years.
To arrive at the just and adequate compensation to be paid defendants for the residence and bomb or fallout shelter, it was conceded by the appraisers for the State, as well as by those for the defendants, that some approach to the matter must be made ■other than from comparable sales inasmuch as, because of its unique character, there were no sales of similar property.
Where unique structures are involved in expropriation proceedings, such as the structure existing in this instance, the proper approach to value is reproduction cost less depreciation. State Through Dept. of Highways v. Barber, 238 La. 587, 115 So.2d 864 (1959); State Through Department of Highways v. Poulan, 160 So.2d 387 (La.App., 2d Cir. 1964); State Through Dept. of Highways v. Carmouche, 155 So.2d 451 (La.App., 3d Cir. 1963); State Through Dept. of Highways v. Welsh, 147 So.2d 758 (La.App., 1st Cir. 1962); State Through Dept. of Highways v. Frellsen, 135 So.2d 378 (La.App., 2d Cir. 1961).
This was the approach used by all the appraisers in arriving at the value of the improvements taken. The four realtors, two for the State and two for defendants, in seeking to determine the reproduction •costs of defendants’ improvements, utilized .a so-called square-foot method for their estimates. This is an inexact and undesirable procedure. The preferable method involves an estimation of the cost of construction including all necessary overhead. Nichols on Eminent Domain, Vol. 5, p. 390.
With respect to evidence in condemnation proceedings as to the evaluation of structures unique in character, the same authority (Nichols on Eminent Domain, Vol. 5, p. 230) points out:
“An expert may be competent for one purpose and not for another. An ordinary real estate agent is not qualified, as such, to testify with respect to construction costs or with respect to the value of a type of property that has no market value by reason of the fact that such type is not commonly bought and sold.”
Defendants’ realtors recognized their lack of qualifications to evaluate the improvements on a reproduction cost basis and conceded that such cost could he more accurately determined by one trained and experienced in cement construction. The inaccuracy of estimations of reproduction costs by realtors is illustrated by the testimony of one of plaintiff’s witnesses. He, as well as the other realtors testifying in the case, could not determine from a visual inspection the character and strength of the foundation of the structure nor of the walls or roof. For instance, the walls of the upper portion were not ordinary asbestos siding over frame construction, or the roof an ordinary 3-ply roof, nor the underground portion of the structure a conventional basement constructed with concrete blocks, as the witness thought from his visual examination of the premises.
Many of the structure’s features were unknown to the realtors; nor could such features be discovered from a visual investigation. Their testimony with respect to these matters and as to which they were not qualified as experts is unconvincing and is entitled to little, if any, weight.
To establish the reproduction or replacement cost of the improvements, including the residence and bomb or fallout shelter, defendants produced as a witness and in *901 troduced the testimony of R. A. Heard. This witness, a graduate of the engineering school of Louisiana Polytechnic Institute with a degree in mechanical engineering, had years of experience as a builder of and in estimating the costs of concrete structures. He had 18 years’ experience with two major oil companies as a contractor or subcontractor in similar masonry type construction of commercial buildings such as oil terminals, warehouses, and service stations. He performed the overall engineering for these projects, made cost estimates, and actually supervised the construction. He was engaged in this character of work at the time of the trial of this case. This witness was, in our opinion, eminently qualified as an expert in the matters concerning which he testified.
Heard was not only consulted by defendant Lemuel P. Crossland, Jr., in the preparation of the plans and specifications for his residence and bomb or fallout shelter, but much of the work came under his observation as it progressed. In preparing to testify as a witness in this cause, Heard was furnished a copy of the plans and specifications from which he calculated in detail the reproduction costs of the improvements in the sum of $60,499.80. Due to increased construction costs from the time of completion of the project until its taking by the State, the cost was discounted at 4% to determine such costs at the time the property was taken by the State. From this, a value of $58,079.23 was placed on the structure as of the date of the expropriation.
The improvements are, however, subject to physical depreciation. Heard calculated this depreciation at 5%. One of the plaintiff’s witnesses would depreciate it at 10% and the other at 16%. This greater rate was calculated on a basis of 50 years as the useful life of the property. Defendants’ witnesses calculated the depreciation at 4% or 5%, based, as was Heard’s estimation, upon a much longer useful life of the property.
Though much of the structure would probably endure for 100 years or more, there were, however, other portions that would deteriorate in a much shorter time. The 7-ply roof, for instance, might possibly be in use as long as 30 to 40 years, or two or three times that of an ordinary roof. The interior walls, ceilings, and woodwork would probably deteriorate much sooner than the main structure. From these facts, we are of the opinion that the physical depreciation should be calculated at a rate of 10% and the valuation discounted by the sum of $5,807.92, thus reducing the value of the improvements at the time of taking to the sum of $52,271.31.
We are impressed that Heard was the only qualified witness testifying with reference to the reproduction costs of the improvements. Plaintiff, at the beginning of the trial, reserved the right to have the case remain open for the taking of the testimony of a cost estimator, if a decision was made to procure such testimony. The reservation was again noted at the conclusion of the trial, whereupon plaintiff was allowed IS days within which to determine whether it would procure the services and testimony of a cost estimator.
Notwithstanding that plaintiff had the benefit of Heard’s testimony and that the plans and specifications were available to an expert of its selection, the State failed to avail itself of the opportunity to procure the services and testimony of an expert on reproduction costs of the property. Heard’s testimony as to the reproduction costs is, therefore, before the court, unassailed and uncontradicted. Under these circumstances, we find no basis to discount Heard’s testimony as to the reproduction costs of the improvements.
Prior to and during the time these improvements were under construction, the federal government was sponsoring and the state government was recommending the construction of bomb or fallout shelters. No change in policy of either government has been noted in the record. Plaintiff con *902 tends, however, that defendants “overbuilt” and that the structure was superadequate. This is pure conjecture. There has been no test of its adequacy — thank goodness!
The expropriation of the right of way severed defendants’ land into two tracts. South of the highway there is a strip approximately 415 feet wide and a half mile long containing 36 acres. North of the highway is an irregularly shaped tract a half mile long comprising 43.1 acres. To reach either of the present tracts from the •other, a distance of seven or eight miles must be traveled. Prior to the taking, access to the property was over a gravel road which was locally maintained. This road, from both directions, now dead-ends at the interstate highway. The tract south of 1-20 is about one mile distant from U. S. Highway 80; the north tract is four or five miles from the Arcadia-Athens highway. Doubt exists as to whether the segments of the former gravel road leading from defendants’ property are or will be maintained. Damages claimed are due to the severance of the tract and to the inaccessibility of either of the portions thereof to the other or to a highway.
Plaintiff’s two witnesses estimated the severance damages to the property at $2,769.00 and $1,978.00 respectively. One of defendants’ witnesses estimated the damage at 50% of the value of the land prior to its taking, or in the sum of $7,850.00. The other witness estimated damages sustained by the tract north of the highway at 75% and the southern tract at 50% of its prior value, or in the sum of $10,300.00. No substantial error in the allowance made has been pointed out or disclosed by our review of the record.
For the reasons assigned, the evaluation of the improvements, including the residence and the bomb or fallout shelter, is increased from $31,631.20 to $52,271.31 and the total award to $67,409.31. Therefore,, the judgment appealed is recast and, accordingly,
It is now Ordered, Adjudged, and Decreed there be judgment herein in favor of the defendants, Lemuel P. Crossland, Jr., and Winford D. Crossland, against the State of Louisiana, through the Department of Highways, for the full sum of Sixty-Seven Thousand Four Hundred Nine and 31/100 Dollars ($67,409.31) with 5% per annum interest thereon from February 27, 1961, until paid less the following credits: Payments of February 27, 1961, of $31,271.00 and of June 23, 1967, of $15,498.20 plus an interest payment of $4,885.03 to June 23, 1967.
It is further Ordered, Adjudged, and Decreed that the State of Louisiana, through the Department of Highways, pay all costs assessable against it including expert-witness fees of L. L. May and O. L. Jordan in the sum of $410.00 each and of R. A. Heard in the sum of $300.00, as well as the cost of the appeal, and,
As thus amended, the judgment appealed is affirmed.
Amended and affirmed.